IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ZAYA WINFIELD CARTER, et al.    :         CIVIL ACTION
                           :
         v.            :
                           :
UNITED STATES OF AMERICA      :         NO. 11-6669

MEMORANDUM

Bartle, J.                                February 7, 2014

      Plaintiffs Briana Winfield ("Winfield") and Rasheed Carter ("Carter"), in their own right as parents and as natural guardians of their minor daughter, Zaya Winfield Carter ("Zaya"), bring this one-count medical malpractice action against the United States of America (the "Government") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674, and 2675(a). When pregnant with Zaya, Winfield received prenatal care from Parkview Health Center ("Parkview"), a clinic that is part of the Public Health Service.[1] The plaintiffs allege that Parkview's negligent failure promptly to notify Winfield or Hahnemann University Hospital, where her child was delivered, of certain prenatal laboratory test results has caused Zaya to suffer hypoxic brain injury, seizures, poor feeding, and other damages.

---

[1] Suit against the Government under the Federal Tort Claims Act is the sole remedy for "damage for personal injury... resulting from the performance of medical... or related functions" at facilities deemed to be a part of the Public Health Service by the United States Department of Health and Human Services. 42 U.S.C. § 233.

Before the court is the motion of the Government for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rule 56(c) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiffs. Id. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

-2-

must be evidence on which the factfinder could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

When ruling on a motion for summary judgment, we may only rely on admissible evidence. See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999). We view the facts and draw all inferences in favor of the nonmoving party. In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## II.

The following facts are undisputed or viewed in the light most favorable to the plaintiffs as the nonmovants. Winfield began her prenatal treatment at Parkview on January 12, 2010. Her estimated due date was August 18, 2010, and her course of treatment went smoothly. On Tuesday, July 27, when Winfield was at 36 weeks and 6 days' gestation, she was tested for Group B Streptococcus ("GBS") colonization as part of her "term labs." She was not scheduled for a follow-up visit at Parkview until Thursday, August 5.

GBS, a type of bacteria, is a leading infectious cause of neonatal morbidity and mortality in the United States. Up to 30 percent of pregnant women are colonized with GBS when they go into

-3-

active labor.  If the condition is untreated, there is a
significant risk of transmitting GBS to the newborn child, which
can cause the child to suffer from a number of serious illnesses.
However, if a mother is given "intrapartum chemoprophylaxis" in the
form of intravenous antibiotics at the time labor, the risk of
transmitting GBS to her child is greatly reduced.

     To combat neonatal GBS disease, the Centers for Disease
Control and Prevention ("CDC") promulgated guidelines for
obstetricians, pediatricians, laboratories, and labor and delivery
facilities.  The CDC guidelines include the following
recommendations:

> - All pregnant women should be screened at 35-37
>   weeks' gestation for vaginal and rectal GBS
>   colonization.... At the time of labor or rupture of
>   membranes, intrapartum chemoprophylaxis should be
>   given to all pregnant women identified as GBS
>   carriers....
> - If the result of GBS culture is not known at the
>   onset of labor, intrapartum chemoprophylaxis should
>   be administered to women with any of [a series of]
>   risk factors....
> - Health-care providers should inform women of their
>   GBS screening test result and the recommended
>   interventions.

The American Academy of Pediatrics and the American College of
Obstetrics and Gynecology adopted these guidelines in 2002.
Consistent with the CDC guidelines, it was Parkview policy to
conduct a GBS test at 36 weeks' gestation and onward, with delivery
anticipated at anywhere from 37 to 40 weeks' gestation.

Parkview received Winfield's GBS test results on Friday, July 30. The tests were abnormal, and Dr. Henry Su, a Parkview physician, made an underlined, handwritten notation on the test result slip to "Tx [treat] in labor." According to Dr. Su, this notation meant that antibiotics were to be given to Winfield when she went into active labor in accordance with the recommendations described above. Winfield's GBS test result, however, was not attached to her chart. Instead it was placed in a folder in which Parkview keeps abnormal test results until a patient is called or returns for an office visit. It was typical at Parkview to wait until a follow-up visit to discuss abnormal lab results.

Winfield was scheduled to deliver her baby at Temple University Hospital, the planned delivery location for all Parkview patients.[2] On Wednesday, August 4, 2010, at approximately 9:15 a.m., Winfield arrived at Temple with complaints of contractions. Because it was determined that she was not in labor, she was discharged at 10:45 a.m. At 10:05 p.m. on the same day, Winfield, complaining of contractions, again appeared at Temple. Once again, Winfield was discharged. She was advised to keep her follow-up appointment at Parkview scheduled for the next day.

The timing of events on the next day, August 5, is of particular importance here. At 6:58 a.m., Winfield was taken by

---

[2]  It was Parkview policy to copy its patients' charts and take them to that hospital. Updates would be faxed or carried by hand.

ambulance to Hahnemann University Hospital, where she was admitted by Dr. Justin Rasner, then a second-year resident physician. Hahnemann was not affiliated with Parkview in any way.  At 7:20 a.m., Dr. Carlene Denis, another Hahnemann physician, noted in Winfield's chart that her GBS status was unknown.  At 7:30 a.m., Dr. Rasner wrote in the chart that Winfield had been seen at Temple the day before and had received prenatal care at Parkview.  He also made an entry that a records request had been sent.  His entry, however, does not disclose to what institution or institutions this request was addressed.

At 7:49 a.m., over an hour before Parkview opened for the day, Parkview's phone records indicate receipt of a call from Hahnemann's main number.  The call lasted 1 minute and 14 seconds. When Parkview was closed, an incoming phone call would ring first at the clinic and would then be forwarded to its independent answering service, Call Center Connect.  Call Center Connect was then to take a message if one was left and, if it was an emergency, forward the message to Parkview's on-call physician for appropriate action.

The 7:49 a.m. call from Hahnemann rang at Parkview and was forwarded to Call Center Connect.  Nonetheless, there is no indication as to who at Hahnemann had called or whether the call was in reference to Winfield.  Nor is there anything in the record to indicate that a message was left at the answering service or

that Call Center Connect sent along any message to the Parkview on-call physician.[3]

At 10:50 a.m., Winfield's membranes had been artificially ruptured.  No medical records for Winfield had been received at Hahnemann at that point.  The hospital chart for Winfield at that time states "[d]espite multiple calls to Temple continue to have had no records sent."[4]  Parkview again received a phone call from the main Hahnemann number at 11:48 a.m.  The call lasted 1 minute and 8 seconds.  Again, there is no information regarding who at Hahnemann made the phone call, whether the call concerned Winfield, or what was said during the call.

Winfield's GBS status remained unknown to her delivery team.  It was noted in her chart that she had none of the risk factors that would have demonstrated the need for the administration of antibiotics during labor.  At 12:19 p.m. on August 5, with her GBS colonization untreated, Winfield gave birth

_____

[3]  While Call Center Connect's "call logs," that is, the actual recordings of phone conversations, are destroyed after 90 days, any messages that Call Center Connect receives are retained. For example, there is a message in Call Center Connect's records from Winfield's mother to the Parkview on-call physician at 9:10 p.m. on August 4, which was just before Winfield was admitted to Temple for the second time on that day.

[4]  There is a fax cover sheet in the record completed by Dr. Rasner and addressed to Temple.  It has no timestamp, but Dr. Rasner believes that he would have had the fax sent around the time of his 7:30 a.m. history and physical.  The number of pages of the fax is consistent with Hahnemann's standard information release form, but there is no evidence of what was actually contained in this fax.

to her daughter Zaya.  At 2:22 p.m., Parkview faxed Winfield's chart to Hahnemann to the attention of Dr. Rasner.  What precipitated this fax is unknown.  The abnormal GBS test result was not included because the Parkview employee tasked with responding to records requests was unaware of the separate folder that contained Winfield's abnormal lab results.

Four days after Winfield and Zaya went home from the hospital, Zaya was admitted at St. Christopher's Hospital for Children with GBS meningitis, obstructive hydrocephalus, and GBS sepsis.

This lawsuit followed.  In their complaint, the plaintiffs claim that Parkview breached its duty of care to them in failing to, among other things:  a) conduct a GBS test or obtain the results of a GBS test; b) attach the results of any GBS test to Winfield's chart; c) immediately notify Winfield of the test results or the recommended course of treatment in anticipation of imminent delivery; and d) notify Hahnemann physicians of the GBS test results or transmit the results to Hahnemann in a timely manner.[5]

---

[5]  The plaintiffs were not provided with Winfield's GBS test results until after discovery began in this litigation.  The plaintiffs do not contest at this stage that a GBS test for Winfield was, in fact, performed and the results obtained.

III.

We first consider the Government's argument that,
because Parkview was not timely informed of Winfield's admission
and labor at Hahnemann, the clinic did not breach any standard of
care in failing to notify the Hahnemann delivery team of Winfield's
GBS test results.  According to the Government, what evidence that
does exist concerning the August 5 communications between Hahnemann
and Parkview is insufficient for a reasonable factfinder to find
for the plaintiffs.  See Anderson, 477 U.S. at 252.  The plaintiffs
counter that there is a genuine dispute of material fact for trial
when the permissible inferences from the evidence are drawn in
their favor.  See Fed. R. Civ. P. 56(c); In re Flat Glass Antitrust
Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Pursuant to the Federal Tort Claims Act, the Government
may be liable to a plaintiff to the same extent as "a private
person[] would be liable to the claimant in accordance with the law
of the place where the act or omission occurred."  28 U.S.C.
§ 1346(b)(1).  Since all relevant events in this action took place
in Philadelphia, the law of Pennsylvania applies.  To make a
successful medical malpractice claim under Pennsylvania law, the
plaintiff must plead and prove the usual elements of negligence:
a) an applicable standard of care; b) breach of that standard of
care by the defendant; c) causation; and d) damages.  Toogood v.
Rogal, 824 A.2d 1140, 1145 (Pa. 2003).  Any trial under

-9-

§ 1346(b)(1) of the Federal Tort Claims Act will be non-jury.  28
U.S.C. § 2402.

Although no expert has established a standard of care on
the issue of notifying an unaffiliated delivery team of positive
GBS test results, a health center such as Parkview cannot be
expected to supply records to a separate hospital such as Hahnemann
unless it knows that one of its patients has been admitted and that
the hospital has requested the patient's records.  See Hightower-
Warren v. Silk, 698 A.2d 52, 54 n.1 (Pa. 1997).  A minimum level of
notice is necessary.  The only direct evidence of contact between
Hahnemann and Parkview on August 5 before the birth of Zaya were
two phone calls to Parkview from Hahnemann's main number, one at
7:49 a.m., and one at 11:48 a.m.

To find for the plaintiffs on the issue of notice to
Parkview, a factfinder would first have to find that these pre-
delivery phone calls concerned Winfield.  There is no such evidence
from which a reasonable inference to this effect can be drawn.
Hahnemann, we note, is a large Center City hospital with many
patients, and Parkview is not a facility dedicated solely to
obstetrics and gynecology.  The number of Parkview patients at
Hahnemann on August 5 or as a general matter on any given day is
unknown.  As a result, any inference that the calls concerned
Winfield would be speculative.  See Robertson v. Allied Signal, 914
F.2d 360, 382 n.12 (3d Cir. 1990).

Even if a factfinder may infer that one or both of the calls concerned Winfield, there is not enough evidence for the factfinder to infer that Parkview had notice of Winfield's status at Hahnemann to supply her positive GBS test results in time to affect Zaya's birth.  The 7:49 a.m. call occurred one hour and eleven minutes before Parkview opened for the day.  All that is known about this communication is its time, its origination at Hahnemann, its length, and that it was forwarded to Call Center Connect, Parkview's independent answering service.  The trail ends here.  Since it was Call Center Connect's practice to send emergency messages along to the Parkview on-call physician when the clinic was closed, the plaintiffs seek an additional inference that:  a) Call Center Connect took a message as a result of the 7:49 a.m. phone call; b) Call Center Connect deemed any message to be an emergency; and c) Call Center Connect forwarded the message to the Parkview on-call physician.  Unfortunately for the plaintiffs, there is nothing in the record to justify any of these inferences.[6]  We do not know the content of the call, and thus we cannot assume that it constituted an emergency which was forwarded.  These suppositions would be speculative without more evidence in

---

[6]  These leaps do not take into account the message from Winfield's mother forwarded to Parkview by Call Center Connect on the evening of August 4, of which there is an extant record.  As a result, to find for the plaintiffs, a factfinder would be required to make a further inference that Parkview forwarded a 7:49 a.m. message to Parkview but failed to record it.

-11-

the record to support them.  See Robertson, 914 F.2d at 382 n.12;

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

We also note that Call Center Connect was an independent

contractor.  Any negligent failure on the answering service's part

to record or forward a message to the on-call physician would not

be attributable to Parkview.  See Hader v. Coplay Cement Mfg. Co.,

189 A.2d 271, 277 (Pa. 1963).

The second phone call, at 11:48 a.m., from Hahnemann's

main number to Parkview occurred only 31 minutes before Winfield

delivered her child.  According to Dr. Rasner, it would usually

take about 30 minutes to an hour for intravenous antibiotics that

he ordered for a patient to be administered, though it could

sometimes happen more quickly.  The CDC guidelines recommend

intrapartum chemoprophylaxis starting "at the time of labor or

rupture of membranes."  Winfield's membranes had been artificially

ruptured by 10:50 a.m., an hour before, and she had clearly been in

labor for a number of hours.  Even assuming that the 11:48 a.m.

phone call to Parkview put Hahnemann on immediate notice of

Winfield's GBS status, and the antibiotics had been administered

immediately, Winfield delivered her baby at 12:19 p.m., only 31

minutes later.  There is nothing before us to suggest that

intravenous antibiotics at such a short interval prior to the time

of birth would reduce the risk of GBS transmission.

Finally, the plaintiffs seek an inference that Hahnemann contacted Parkview on August 5 at times other than the two phone calls noted in Parkview's records.  The plaintiffs argue that this inference is warranted because: a) the Hahnemann delivery team knew that Winfield had received prenatal care at Parkview; b) Dr. Rasner noted in her chart that a records request had been sent at 7:30 a.m. and that his team had made "multiple" attempts to obtain Winfield's records by 10:50 a.m.; and c) that Parkview did eventually fax Winfield's prenatal chart to Dr. Rasner's attention at Hahnemann after Zaya's birth.

This line of thinking ignores the serious gaps in the evidence.  While there is evidence that a fax was sent by Dr. Rasner to Temple at 7:30 a.m., there is no evidence to indicate that a fax was then sent to Parkview.  Moreover, the full text of Dr. Rasner's 10:50 a.m. notation in Winfield's chart states, "[d]espite multiple calls to Temple continue to have had no records sent."  There is no evidence that Temple had contacted Parkview as a result of those calls.  Simply stated, there is no evidence of any pre-birth communication between Hahnemann and Parkview other than the two phone calls discussed above, and no reasonable inference can be made that Hahnemann or Temple made other timely contact with Parkview.

In sum, there is insufficient evidence in the record from which reasonable inferences can be drawn that Parkview had

timely notice to send to Hahnemann Winfield's positive GBS test results so that the appropriate antibiotics could have been administered to her to prevent serious injury to her baby.  We will therefore grant the motion of the Government for summary judgment on the plaintiffs' claim insofar as it relates to any failure by Parkview to notify the Hahnemann delivery team of Winfield's GBS status on August 5.

We will further grant the motion of the Government to the extent the plaintiffs seek recovery for Parkview's maintenance of Winfield's GBS test results in a folder separate from her medical chart.  This practice could not have caused injury to the plaintiffs in the absence of timely notice to Parkview of Winfield's labor at Hahnemann.

IV.

Even if Parkview was not negligent in failing to provide Hahnemann on August 5, 2010 with Winfield's GBS test results, the plaintiffs claim that Parkview breached the required standard of care in failing to inform Winfield herself of her test results rather than waiting for her follow-up visit scheduled for August 5. The Government moves for summary judgment on the ground that the plaintiffs' experts on this issue are not competent to testify. Dr. Lisa Saiman, a physician experienced in pediatric infectious disease and hospital epidemiology, is prepared to opine that with Winfield's delivery imminent, Parkview should have notified her of

-14-

her positive GBS test results when Parkview received them on Friday, July 30 rather than waiting to do so at her August 5 follow-up visit.[7]

The competency of a witness to testify in a civil case in federal court is a function of state law when the rule of decision on a claim or defense is a state-law matter.  Fed. R. Evid. 601; Miville v. Abington Mem'l Hosp., 377 F. Supp. 2d 488, 493 (E.D. Pa. 2005).  As previously discussed, Pennsylvania substantive law applies to this claim brought against the Government under the Federal Tort Claims Act.  28 U.S.C. § 1346(b)(1).  The Pennsylvania Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 Pa. Cons. Stat. Ann. § 1303.101 et seq., provides rules to determine the competency of experts in a medical malpractice matter, and we are therefore bound to apply those rules in this case.  Miville, 377 F. Supp. 2d at 493.

Under the MCARE Act, "[n]o person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable."  40 Pa. Cons. Stat. Ann.

---

[7]  Bruce Podrat, the plaintiffs' expert in hospital administration, is prepared to offer testimony to the same effect.  The Government also challenges his competency.

§ 1303.512(a).  For an expert testifying specifically on the
applicable standard of care, § 1303.512 of the MCARE Act ordinarily
requires the witness to possess a narrowly suited background:

> [A]n expert testifying as to a physician's
> standard of care ... must meet the following
> qualifications:
>         (1) Be substantially familiar with
> the applicable standard of care for the
> specific care at issue as of the time of
> the alleged breach of the standard of
> care.
>         (2) Practice in the same
> subspecialty as the defendant physician
> or in a subspecialty which has a
> substantially similar standard of care
> for the specific care at issue.... [and]
>         (3) In the event the defendant
> physician is certified by an approved
> board, be board certified by the same or
> a similar approved board....

Id. § 1303.512(c).

        While an expert testifying on the standard of care in a
Pennsylvania medical malpractice action must always be
"substantially familiar with the applicable standard of care for
the specific care at issue" as required by § 1303.512(c)(1), the
statute provides a limited exception to the subspecialty
requirement of subsection (2) and the board certification
requirement of subsection (3).  Section 1303.512(e) provides:

> A court may waive the same specialty and board
> certification requirements for an expert
> testifying as to a standard of care if the
> court determines that the expert possesses
> sufficient training, experience and knowledge
> to provide the testimony as a result of active
> involvement in or full-time teaching of

-16-

> medicine in the applicable subspecialty or a
> related field of medicine within the previous
> five-year time period.

Id. § 1303.512(e).  To determine whether a proffered expert has

"active involvement in ... a related field of medicine," the

expert's field and the defendant-physician's field must be

"assessed with regard to the specific care at issue" and not in a

general sense.  Vicari v. Spiegel, 989 A.2d 1277, 1284 (Pa. 2010).

By the same token, the statutory phrase, "related field

of medicine," means "more than fields of medicine which are

'related' in the most generic sense of the word."  Vicari, 989 A.2d

at 1283.  Rather, "[t]he statute should be read to require a close

enough relation between the overall training, experience, and

practices of the expert and that of the defendant-physician to

assure the witness's expertise would necessarily extend to

standards of care pertaining in the defendant-physician's field."

Id. (quoting Gbur v. Golio, 963 A.2d 443, 452 (2009) (opinion

announcing judgment)).  This analysis requires reference to the

specific care at issue and is "likely to require a supporting

evidentiary record and questioning of the proffered expert during

voir dire."  Id. at 1284.

In the present action, the Parkview physician who

handled Winfield's GBS test results practiced in obstetrics and

gynecology ("OB/GYN"), for which he was board certified.  The

plaintiffs' expert, Dr. Saiman, is board certified in pediatrics

-17-

and pediatric infectious diseases and practices medicine in those subspecialties.  Since she is neither board certified nor in practice as an OB/GYN, Dr. Saiman is competent to testify in this action only if there is evidence that she has "sufficient training, experience and knowledge as a result of active involvement in ... a related field of medicine" under § 1303.512(e) of the MCARE Act. 40 Pa. Cons. Stat. Ann. § 1303.512(e); Vicari, 989 A.2d at 1284.

In Vicari v. Spiegel, the Supreme Court of Pennsylvania analyzed in depth the exception found in § 1303.512(e).  See Vicari, 989 A.2d at 1280-86.  The issue in Vicari was whether a medical oncologist could testify as to the standard of care owed by an otolaryngologist and a radiation oncologist to a tongue cancer patient after a successful surgical intervention.  Id. at 1278-79; 1283.  Specifically, the defendant-physicians had failed to recommend that the patient seek follow-up chemotherapy from a medical oncologist.  Id. at 1279.  The trial court had held that the plaintiff's medical oncologist was not competent because he was not certified by the same board as the defendants.  Id. at 1283. The Superior Court reversed, relying on § 1303.512(e).  Id. at 1280.  The Supreme Court affirmed the ruling of the Superior Court. Id. at 1283.

In doing so, the state Supreme Court placed significant emphasis on "the complex and multi-disciplinary nature of many [cancer] treatment regimens."  Id. at 1284.  Indeed, treatment

-18-

decisions are often made by consensus among a "multi-disciplinary panel of physicians known as a 'tumor board,'" a committee that frequently includes medical oncologists.[8] Id.  As the Court explained, the relatedness of the two fields at issue sprang "from the complexities and realities of modern cancer therapy, during which an individual cancer patient often obtains different treatments under the auspices of different specialties of medical practice, and different specialists often treat the patient in a sequential but coordinated manner." Id.  This relationship, paired with the expert's 30 years' experience in medical oncology and other qualifications, supported the application of the § 1303.512(e) exception in that case.  Id. at 1285.

The state Supreme Court has not had an occasion to opine on the substance of § 1303.512(e) since Vicari, but thereafter the Superior Court dealt with the issue in Renna v. Schadt.  64 A.3d 658 (Pa. Super. Ct. 2013).  We may turn to decisions of the intermediate appellate court for assistance in our prediction of how the state's highest court would rule.  Gares v. Willingboro Twp., 90 F.3d 720, 725 (3d Cir. 1996).  In Renna, the relevant issue was whether § 1303.512(e) could operate to permit an expert

---

[8]  The Supreme Court of Pennsylvania emphasized that it was "not suggesting that service on a tumor board is determinative in establishing that a proffered expert is competent to testify," but rather that this sort of multidisciplinary collaboration is a "relevant and significant factor" in the analysis pursuant to § 1303.512(e).  Id. at 1285 n.11.

board certified in pathology to testify concerning a surgeon's choice of methods for obtaining a biopsy.  Renna, 64 A.3d at 664.

Because "[p]athology provides the diagnosis from the specimen that the surgeon provides," and the prospective expert had knowledge of and experience with the relative merits of different types of biopsies, the court concluded that the pathologist was sufficiently knowledgeable to testify.  Id. at 667.  It was immaterial that the expert held no opinion on the actual performance of the surgical procedure in question.  Id. at 668.  The "overlapping expertise" of pathologists and surgeons on the issue of the standard of care in choosing biopsy methods supported the court's decision to apply § 1303.512(e).  Id.

The matter presently before this court is in many important respects similar to Vicari and Renna.  Like the cancer treatment discussed in Vicari, the treatment of neonatal GBS disease is "complex and multidisciplinary."  Id. at 1284.  The CDC guidelines on prevention of neonatal GBS disease have been adopted by both the American College of Obstetricians and Gynecologists and the American Academy of Pediatricians as the standard of care.[9] The prevention of GBS disease in a newborn child is a

---

[9]   The CDC guidelines themselves reflect the multidisciplinary nature of the problem of GBS transmission to newborn children. The guidelines "are intended for the following groups: providers of prenatal, obstetric, and pediatric care; supporting microbiology laboratories, hospital administrators and managed care organizations; childbirth educators; public health authorities; and expectant parents and their advocates."

quintessential example of a healthcare scenario in which a patient "obtains different treatments under the auspices of different specialties of medical practice, and different specialists often treat the patient in a sequential but coordinated manner." Id.  An OB/GYN treats the pregnant woman and the prenatal child while the pediatrician treats the child once it is born.  This is a classic case where physicians with different specialties treat the patient "in a sequential but coordinated manner."

Pediatricians can have knowledge of the best time to notify an obstetrical patient of her positive GBS test results. When delivery is imminent, this issue can have serious implications for the pediatrician's subsequent treatment of a newborn.  See Renna, 64 A.3d at 667.  In this respect, just as a pathologist can be competent to testify on the adequacy of a surgeon's choice of biopsy even in the absence of knowledge of surgical procedures, a pediatrician can be competent on the issue of making GBS test results timely known to a patient even when the pediatrician is not familiar with other issues of prenatal care.  See id. at 667–68. We conclude that there is a "close enough relation between the overall training, experience, and practices" of experts in pediatrics and those in obstetrics and gynecology "to assure the witness's expertise would necessarily extend to standards of care pertaining in the defendant-physician's field" as to the specific care at issue.  Vicari, 989 A.2d at 1283.

Moreover, there is evidence to demonstrate that the plaintiffs' expert, Dr. Saiman, has "the overall training, experience, and knowledge to testify as to the specific standard of care at issue." Id. at 1285.  Dr. Saiman is familiar with the CDC guidelines and the importance of a known, positive GBS test result in determining the course of treatment at the time of labor and thereafter.  She has practiced pediatrics for over 30 years and epidemiology for over 20 years.  Dr. Saiman has been a frequent lecturer around the United States and the world on the use of antibiotics and the treatment of infectious diseases in the pediatric setting, and she has published several articles on bacterial infection in neonatal intensive care units.  She has demonstrated extensive knowledge on the methods used to prevent bacterial infection in children.

We conclude that Dr. Saiman's "training, experience, and knowledge" of the use of GBS test results to prevent neonatal GBS disease makes her competent to testify as to the standard of care for notifying a patient of a GBS test result that was obtained specifically to ensure the health of a newborn child.[10] Id.  The motion of the Government for summary judgment will be denied on the

---

[10] Because of this conclusion, we need not consider the Government's additional contention that Bruce Podrat, the plaintiffs' expert on hospital administration, is incompetent under the MCARE Act to testify on the issue of whether Winfield should have been made aware of her positive GBS test results before August 5.  We leave a decision on Mr. Podrat's competency as a witness for a later date.

issue of whether Parkview breached the applicable standard of care in failing to inform Winfield of her positive GBS test results before August 5.  While we decide that Dr. Saiman is competent to testify, we make no decision at this time on the merits of her testimony or on the weight to be afforded that testimony.

V.

In sum, we will grant the motion of the Government for summary judgment in part, and we will deny it in part.  The motion of the Government will be granted to the extent the plaintiffs' claim for relief is founded on the failure of Parkview to perform a GBS test for Winfield, to make Hahnemann aware of Winfield's abnormal GBS test results on August 5, or to maintain Winfield's GBS test results with her medical chart.  The motion will otherwise be denied.